Janice TURNER and Moshe D. Brown, By and Through Janice Turner, his Guardian ad Litem, Plaintiffs,

v.

CITY OF NORTH CHARLESTON; J. Al Cannon, Chief of Police; Barbara Knight; John Taft Jordan; Merv Powell; Robert Wesley Thompson; Harry Charles Delger; Samuel Shifflet; Tamara Mincey, Unidentified Supervisory Personnel, and Officers of the North Charleston Police Department, in their official and individual capacities, Defendants.

Civ. A. No. 2:85–1402–8.

United States District Court,
D. South Carolina,
Charleston Division.

Dec. 14, 1987.

Terry A. Rickson, Charleston, for plaintiffs.

James E. Gonzales, Merrill A. Cox, Wheeler M. Tillman, Allan R. Holmes, Charleston, S.C., J.C. Coleman, Columbia, S.C., Diane S. Goodstein, Summerville, S.C., for defendants.

1. As to these defendants, the magistrate found that "there was no indication that they knew of any affirmative duty owed the plaintiff or any special relationship with the plaintiff" and that

## ORDER

BLATT, Chief Judge.

This matter is before the court on the defendants' motions for summary judgment. The issue under consideration by the court at this time is whether the good faith immunity doctrine, which would foreclose liability of the individual defendants, is applicable. The record includes the report and recommendation of a United States Magistrate in which the magistrate recommends that summary judgment be denied as to defendants, Merv Powell, Barbara Knight, Harry Charles Delger and Robert Wesley Thompson; in addition, the magistrate recommends that summary judgment be granted as to defendants, Tamara Mincey, John Taft Jordan and Samuel Shifflet.[1] In accordance with 28 U.S.C. § 636, the parties filed timely objections to the magistrate's report.

The report and recommendation of the United States Magistrate was made in accordance with 28 U.S.C. § 636 and the local rules of this district concerning reference to a magistrate. *See United States Magistrates,* Local Rule 19, D.S.C.; *Social Security Cases,* Local Rule 20, D.S.C.; *Bowman v. Bordenkircher,* 522 F.2d 209 (4th Cir.1975). Under 28 U.S.C. § 636(b),

> [a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions.

Absent timely objection from a dissatisfied party, however, it does not appear that Congress intended to require a district court to review, under a *de novo* or any other standard, a magistrate's factual or legal conclusions. *Thomas v. Arn,* 474 U.S. 140, 148, 106 S.Ct. 466, 472, 88 L.Ed.2d

"it cannot be said that their actions were substantial factors or the proximate cause of the deprivation of constitutional rights." Magistrate's Report at p. 14.

435 (1985), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986). However, the authority, as well as the responsibility, to make an informed, final determination remains with the judge. *Mathews v. Weber,* 423 U.S. 261, 271, 96 S.Ct. 549, 554, 46 L.Ed.2d 483 (1976).

The defendants' objections can be summarized as follows:

1) the alleged failure to protect the plaintiffs was not gender, domestic or family based, or violative of the fourteenth amendment;

2) the defendants did not owe the plaintiffs an affirmative duty of protection since a special relationship did not exist between the plaintiffs and the defendants; moreover, in any event, if an affirmative duty did exist, this duty was not clearly established by law;

3) the individual defendants are entitled to the good faith immunity defense, which would relieve them of any liability.

The determination of the issue of whether or not an affirmative duty to protect existed, and whether this duty was *clearly* established by law at the time of the incident here involved, is essential to resolve the question now before the court, i.e., whether the defendants can be held personally liable in this action, or whether these defendants are entitled to qualified immunity as a complete defense to such personal liability.

The test for qualified immunity was set forth by the Supreme Court in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In that case, the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. In the present case, the plaintiffs allege that the defendants owed plaintiffs an affirmative duty of protection. Therefore, this court must address the question of whether or not there existed, at the time of the incident, a clearly established statutory or constitutional right of the plaintiffs to protec-

tion. If this right to protection was not then "clearly established," these defendants are entitled to qualified immunity and, thus, to summary judgment.

The Fourth Circuit Court of Appeals addressed the "duty of protection" issue in *Fox v. Custis,* 712 F.2d 84 (4th Cir.1983). That court generally followed the approach of the Court of Appeals of the Seventh Circuit in finding that "there simply is 'no constitutional right to be protected by the state against ... criminals or madmen,' and that because in corollary, there is no 'constitutional duty [on the state] to provide such protection, its failure to do so is not actionable under section 1983.' " *Fox,* 712 F.2d at 88, quoting *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982). The Fourth Circuit recognized an exception to this principle by stating that "a right and corollary duty may arise out of special custodial or other relationships created or assumed by the state in respect of particular persons." *Fox,* 712 F.2d at 88. However, the court did not set forth a general definition of the required "special relationship" that would give rise to a right, a violation or deprivation of which would be actionable under § 1983.

Subsequently, the Fourth Circuit, in *Jensen v. Conrad,* 747 F.2d 185 (4th Cir.1984), elaborated on the *Fox* case as follows:

*Fox* completed the convergence of eighth and fourteenth amendment analysis that had begun in *Doe* [*Doe v. New York City Department of Social Services,* 649 F.2d 134 (2d Cir.1981)] and took shape in *Bowers.* The constitutional right that we asserted could arise was clearly based on the fourteenth amendment, but the shape and definition that we gave to that right by using the term "custodial or other relationship" was influenced in large part by the considerations that lay behind the eighth amendment cases. Recognizing that the fourteenth amendment could not be read to establish a general affirmative duty to the public at large, we chose to limit that duty by applying a rationale similar to that used in *Estelle* [*Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)]:

namely, that where the state had selected an individual from the public at large and placed him in a position of danger, the state was enough of an "active tortfeasor" to make it only "just" that the state be charged with an affirmative duty of protection.

Therefore, since a right of protection may exist under some circumstances, this court must determine if that right has been properly invoked by the plaintiffs in this case. Before making that determination, however, this court notes that the Supreme Court has stated that immunity cannot be converted into liability by the mere allegation of extremely abstract rights. The right allegedly violated by the official "must have been 'clearly established' in a more particularized, and hence more relevant, sense: [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* —— U.S. ——, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The Supreme Court also stated that "in the light of preexisting law the unlawfulness must be apparent." *Anderson,* 107 S.Ct. at 3039.

A review of the events arising from the protracted domestic dispute in this case is essential to a decision here. Accordingly, the facts as cited by the magistrate, to which the parties have not objected, are incorporated herein, and quoted as follows:

The evidence of record indicates that Vernon Fair, armed with butcher knife, attacked Turner in March, 1980. (Turner Deposition, June 12, 1985, pp. 68, 69). A month later during an ensuing quarrel, Turner shot Fair. (Turner Deposition, June 12, 1985, p. 68). Subsequently, in March, 1981, Fair struck Turner, resulting in charges of assault and battery which were later dismissed. (Turner Deposition, June 12, 1985, pp. 71, 71). In April, 1982, Fair attacked Turner, and subsequently was charged with abduction and rape. (Turner Deposition, June 12, 1985, p. 62).

Next, on January 15, 1983, Fair entered Turner's home, forcing her at gun point to accompany him to a hotel on Spruill Avenue, and eventually striking her in the head with the butt of the gun before the police interceded. (Turner Deposition, June 12, 1985, p. 61). This led to a prison sentence for Fair.

On August 1, 1984, Fair cut Turner and again abducted her. A shoot-out occurred in the City of Charleston and Turner was shot several times. This particular shooting resulted in the arrest and eventual incarceration of Fair.

Thereafter, Turner sought a divorce and temporary restraining order against Vernon Fair on August 24, 1984. (Goldstein Deposition, August 26, 1985, p. 37). On September 10, 1984, the temporary restraining order was made permanent, thereby forbidding Fair from following Turner "on foot or in an automobile, physically abusing petitioner, or harassing or harming petitioner in any manner whatsoever."

In October, 1984, Fair, armed with a knife, entered Turner's home threatening bodily harm. (Turner Deposition, June 12, 1985, p. 19). At about the same time, Fair again commenced calling Turner, threatening both her and her children.

On November 8, 1984, at approximately 4:20 a.m., Turner phoned the City of North Charleston Police Department and spoke with duty officer, Harry Charles Delger. She informed Officer Delger that Fair had just phoned her. She did not report that Fair had threatened her, but did report that she feared he might attempt to harm her in light of the fact that she was to appear on the following day at a hearing regarding Fair's probation violation. She requested that a car patrol her area.

The next day, November 9, 1984, at approximately 5:51 a.m., Turner phoned the North Charleston City Police Department and spoke with duty officer, Robert Wiley Thompson. At the onset of the conversation, the plaintiff informed Officer Thompson that there was an outstanding peace bond and bench warrant against Vernon Fair and that Fair had just telephoned and threatened her. She requested that a patrol car be sent to her area.

At approximately 3:15 p.m., a second call was placed to the North Charleston City Police Department by Moshe Brown, Turner's son. Brown first spoke with Officer Tamara Mincey informing her that Fair had been continuously calling his house threatening him and his family. Officer Mincey responded by telling Brown to call the duty officer and provided him with the appropriate number. Accordingly, Brown dialed the number and spoke with duty officer John Taft Jordan. Brown then informed Officer Jordan that Fair was calling threatening his family's lives. Officer Jordan responded to Brown's statements by telling him that a warrant could not be obtained over the phone.

Again at approximately 7:03 p.m., Janice Turner phoned the North Charleston City Police. This time, the plaintiff spoke with duty officer Samuel Robert Shifflet. Once again, the plaintiff informed the officer that Fair was threatening her and her children and requested that a patrol car be sent to the area.

At approximately 7:50 p.m., Fair entered the residence of Janice Turner and shot her several times in the head. While fleeing from the scene, Fair attempted to shoot Moshe Brown. Finally, the North Charleston City Police Department dispatched a car at approximately 8:00 p.m. to Turner's residence.

[Magistrate's Report, pp. 2–5].

The above chronology of events does not incorporate the actions or inactions of defendants Barbara Knight, Merv Powell, or Chief J. Al Cannon. Barbara Knight was the communications supervisor for the City of North Charleston Police Department. The plaintiffs contend that the policies followed by the duty officers were developed in a reckless manner by Knight, consequently resulting in the deprivation of their constitutional rights. Similarly, the plaintiffs allege that Chief Cannon failed to properly train the police officers.

Defendant Merv Powell was a detective with the North Charleston Police Department. Turner had previously worked with him in law enforcement matters concerning Fair and she made several attempts to contact him by phone on November 9, 1984. After hearing of the shooting on the police radio, defendant Powell acknowledged to the dispatcher that Turner had attempted to reach him earlier in the day. The plaintiffs contend that defendant Powell's failure to return Turner's calls, and his failure to make further inquiry, proximately caused the injuries sustained by plaintiffs. With all of these facts in mind, the plaintiffs urge this court to find that a special relationship between the state and the plaintiffs existed which created an affirmative duty of protection on the part of all of the individual defendants.

As mentioned above, neither the Fourth Circuit nor the Supreme Court has provided specific guidelines that would enable this court to determine precisely what constitutes a "special relationship." However, as recognized by the magistrate, the Fourth Circuit in *Jensen* identified some factors that should be considered in a "special relationship" analysis. These factors include:

1. Whether the victim or the perpetrator was in legal custody at the time of the incident, or had been in legal custody prior to the incident;

2. Whether the state has expressly stated its desire to provide affirmative protection to a particular class or specific individuals.

3. Whether the State knew of the claimants' plight.

*Jensen,* 747 F.2d at 185, n. 11. The magistrate found, and this court agrees, that the first factor has been met. The perpetrator was in legal custody prior to the incident and was on probation at the time of the incident.

■ The remaining factors are couched more in terms of state action rather than action by the individual officers. As to the second factor, this court finds that the state has not expressly stated its desire to provide *affirmative protection*—(emphasis added)—to a particular class or specific individuals involved in domestic quarrels or violence. Although the state enacted, in July, 1984, the Protection from Domestic

Abuse Act, S.C.Code Ann. § 20–4–20 *et seq.*, the Act does not appear to create an initial, express duty of protection, or intervention, in domestic abuse cases, but rather provides only that law enforcement officers take certain protective measures when responding to a domestic abuse incident. Pursuant to S.C.Code Ann. § 20–4–100, generally, the law enforcement officer must notify the abused person of the right to initiate criminal proceedings and to seek an order of protection, and the officer must advise the parties of the importance of preserving evidence. Additionally, the officer may offer or arrange to provide transportation of the abused person to a hospital or to a place of shelter. Therefore, the statute is addressed to follow-up procedures rather than to any affirmative duty to protect a person prior to a domestic abuse incident.[2]

■ Finally, as to the third factor, the magistrate found that "as a result of telephone calls on the day of the incident as well as the prolonged record of domestic violence, the state (city) knew of the plaintiff's plight." Magistrate's Report, p. 10. However, this fact does not mean that, for purposes of qualified immunity analysis, the officers individually knew of the plaintiff's plight. Instead, "this factor goes more to the breach of the 'special relationship' than a definition of the relationship." However, "it may prove probative of the extent to which the State intended to protect or watch over the particular claimant." *Jensen,* 747 F.2d at 195, n. 11. This court cannot find that the State (municipality) placed the plaintiffs in a position of danger, nor did it single out the plaintiffs and place them in its care.

■ After consideration of these factors and the circumstances of this case, this court does not feel that a special relationship between the plaintiffs and the city existed that created an affirmative duty of protection on the part of the City of North Charleston and its police officials. Furthermore, even if a special relationship had arisen under the law when the incident here involved occurred, this court is of the opinion that such relationship was not so clearly established that the defendants could, or should have, foreseen its existence. Due to the absence of specific guidelines to determine whether a special relationship existed, and in light of the fact that only 34 days had passed since the *Jensen* decision which arguably established such relationship, this court does not find, under the circumstances of this case, that the right to an affirmative duty of protection was so sufficiently clear that a reasonable official would understand that what he was doing violated that right.[3]

This court agrees with the magistrate that "defendants Mincey, Jordan, and Shifflet did nothing more than routinely handle a phone call from the plaintiff or her son." Magistrate's Report, p. 14. As to defendant Powell, he was apparently aware of the relationship between Turner and Fair, and of Fair's criminal record, but he did not return Turner's telephone calls for assistance. This court feels that it is not clear that a reasonable official would understand that he is violating someone's constitutional right by failing to return telephone calls.

As to defendants Delger and Thompson, once again, it is not clear that a reasonable official would have known that his action was violative of the plaintiffs' rights.

2. A state statute, by itself, cannot create a substantive constitutional right. *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). The law that must be "clearly established" is a constitutional right to protection by the State (municipality). If this right is not clearly established, good faith immunity may be invoked regardless of the language of·the statute. See *Jensen,* 747 F.2d at 195, n. 12.

3. This court also notes that the United States Supreme Court has not yet addressed the specific duty of protection claimed herein. Further-

more, in *Schlothauer v. Robinson,* 757 F.2d 196 (8th Cir.1985), the court, in a warrantless arrest case, implied that its finding eleven days earlier that a warrantless arrest of a defendant in his home, in the absence of exigent circumstances, violated the Fourth Amendment, was insufficient time to place a reasonable official on notice of the newly established right. As indicated, the facts herein reveal that *Jensen,* from which the plaintiffs assert a duty of protection, was decided only thirty-four days prior to the domestic abuse incident on November 9, 1984.

Turner spoke with Delger on November 8, 1984, prior to the November 9, 1984, shooting. Turner reported that she thought Fair would harm her since Turner was going to appear at Fair's probation violation hearing and she requested that a car patrol her area. Assuming, *arguendo*, that a patrol car was not sent until 8 p.m., this court finds that since the right to an affirmative duty of protection was not sufficiently clear, it cannot be said that a reasonable official, acting similarly to Delger, would understand that what he was doing violated that right. Similarly, the court makes the same finding as to defendant Thompson, who had no prior knowledge of the Turner–Fair domestic violence, but who allegedly was informed by Turner in her call for assistance that a bench warrant for Fair existed and that Fair was threatening her.

The remaining defendants are Barbara Knight and Chief J. Al Cannon. Barbara Knight was the communications supervisor with the City of North Charleston Police Department. Her duties included overseeing the communications department and training the communications technicians who were the dispatchers. Defendant Knight alleges that she was not involved with the training of the duty officers. Furthermore, this claim appears to be directed to acts of defendant Knight in her official capacity, rather than her individual capacity. In any event, this court finds that since the duty to provide affirmative protection was not clearly established under the facts of this case, it cannot be said that her conduct in training dispatchers violated constitutional rights of which a reasonable person would have known. As to defendant Cannon, it appears that he had no involvement with the deprivation of any rights of the plaintiffs. He was named as a defendant because of his position as Chief of Police and his alleged failure to properly train the officers. In light of this court's holding, nothing herein indicates that Chief Cannon should be held individually liable.

In evaluating the conduct of these defendants, this court has taken into consideration the recent Fourth Circuit opinion in the case of *Tarantino v. Baker*, 825 F.2d 772, 774 (4th Cir.1987) in which the court quoted from the Fifth Circuit, as follows:

> Police officers can be expected to have a modicum of knowledge regarding the fundamental rights of citizens. Lawlessness will not be allowed to pervade our constabularies. However, in holding our law enforcement personnel to an objective standard of behavior, our judgment must be tempered with reason. If we are to measure official action against an objective standard, it must be a standard which speaks to what a reasonable officer should or should not know about the law he is enforcing and the methodology of effecting its enforcement. Certainly we cannot expect police officers to carry surveying equipment and a Decennial Digest on patrol; they cannot be held to a title-searcher's knowledge of metes and bounds or a legal scholar's expertise in constitutional law.

*Saldana v. Garza*, 684 F.2d 1159, 1165 (5th Cir.1982).

In *Tarantino*, the court noted that when qualified immunity is asserted, "the legal inquiry often focuses not so much on the 'clarity' of the right allegedly violated as on whether the officers' actions 'clearly' infringed that right." Assuming, *arguendo*, that a constitutional right did exist, this court is not convinced that the defendants' conduct clearly infringed that right.

Accordingly, inasmuch as this court has determined that the conduct of the individual defendants did not violate clearly established constitutional rights of which a reasonable person would have known at the time herein involved, *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738, and that, in light of preexisting law, the unlawfulness of the defendants' conduct is not apparent, *Anderson*, 107 S.Ct. at 3039, the defendants are entitled to qualified immunity and to summary judgment as to personal liability.

The plaintiffs' claims against the City of North Charleston, and against the officers in their official capacities, are recommitted

to the magistrate for further recommendations.

AND IT IS SO ORDERED.