MICHAEL KEITH BRASWELL, ADMINISTRATOR OF THE ESTATE OF LILLIE STANCIL BRASWELL, DECEASED, PLAINTIFF v. BILLY R. BRASWELL AND RALPH L. TYSON, SHERIFF OF PITT COUNTY, DEFENDANTS

No. 883SC463

(Filed 1 May 1990)

1. **Sheriffs and Constables § 4 (NCI3d); Public Officers § 10 (NCI3d)— sheriff's promise of protection—liability for failure to protect—sufficiency of evidence**

Plaintiff's evidence was sufficient for the jury on the issue of defendant sheriff's negligence in failing to protect plain-

BRASWELL v. BRASWELL

[98 N.C. App. 231 (1990)]

tiff's intestate from her husband, a deputy sheriff, where it tended to show that the sheriff was aware that decedent had been physically abused by her husband in the past; decedent told the sheriff she was going to leave her husband and asked for protection; decedent advised the sheriff about a letter written by her husband indicating an intent to kill her; the sheriff promised to protect her from her husband and to see that she got to and from work safely but failed to do so; decedent's husband shot her to death while she was on her way to work a few days after leaving him; and decedent's reliance on the promise of protection was causally related to her death in that she took no other steps for her safety because she believed the sheriff's officers were monitoring her movements and those of her husband.

**Am Jur 2d, Sheriffs, Police, and Constables §§ 94, 150.**

2. **Sheriffs and Constables § 4 (NCI3d); Public Officers § 10 (NCI3d) — law officers — failure to protect domestic violence victims — no statutory liability**

N.C.G.S. Ch. 50B does not establish an affirmative duty on the part of law enforcement agencies to protect victims or threatened victims of domestic violence upon request so as to give the victim a cause of action for a breach of that duty. Furthermore, Ch. 50B does not apply where the victim failed to seek protection by filing the authorized civil action. N.C.G.S. § 50B-5(b).

**Am Jur 2d, Sheriffs, Police, and Constables §§ 94, 150.**

3. **Sheriffs and Constables § 4 (NCI3d); Public Officers § 10 (NCI3d) — shooting by deputy sheriff — negligent retention and supervision by sheriff — insufficiency of evidence**

A sheriff was not liable in damages for the shooting death of a deputy's wife by the deputy on the theory of negligent retention and supervision after learning that the deputy was unfit to carry a gun where the shooting occurred while the deputy was off duty; there was no evidence that the deputy was required to carry a gun while off duty or that his service revolver was the fatal weapon; and the evidence thus did not show that the victim's death was proximately caused by the sheriff's entrustment of a service revolver to the deputy.

**Am Jur 2d, Sheriffs, Police, and Constables §§ 94, 150.**

BRASWELL v. BRASWELL

[98 N.C. App. 231 (1990)]

Judge COZORT concurring.

Judge GREENE concurring in part and dissenting in part.

APPEAL by plaintiff from *Smith, Judge.* Judgment entered 8 October 1987 in Superior Court, PITT County. Heard in the Court of Appeals 7 December 1988.

On 27 September 1982 plaintiff's decedent was shot and killed by defendant Braswell, her estranged husband, who was then employed by defendant Sheriff as a Deputy Sheriff, as he had been for eight years. Before trial plaintiff's wrongful death action against defendant Braswell was voluntarily dismissed and the part of his action against the defendant Sheriff based upon *respondeat superior* was dismissed by summary judgment. At trial the remaining claims against defendant Sheriff based upon his independent negligence were dismissed by a directed verdict at the close of plaintiff's evidence. Only the trial dismissal is contested by the appeal. Plaintiff's evidence pertinent thereto—consisting largely of the deposition testimony of defendant Tyson and Lillie Braswell's hearsay statements to various friends during the last ten days of her life—when viewed in the light most favorable to the plaintiff is to the following effect:

Defendant Sheriff had known for ten years that Billy Braswell had beaten Lillie Braswell on several occasions, and that five years earlier he had beaten her to the point where hospitalization was required. On Wednesday, 22 September 1982, Lillie Braswell went to Sheriff Tyson's office and told him that because of Braswell's long abuse she was going to leave him and was afraid that he would hurt her; that Braswell had stated "you're not going anywhere . . . none of us is going anywhere . . . [i]f I can't have you, nobody is going to have you"; that in fear of him she had locked herself in her bedroom for two days; that several years earlier he held a gun at her head; that since telling him she was going to leave he had been sitting around the house staring directly at her for long periods of time and had three letters or envelopes in his hand that he tapped on his knee as he stared at her. The Sheriff told her that if she found out what was in those letters to let him know. She asked to have deputies stand by her house while she moved out and he promised to send somebody. Later that afternoon when she called Tyson about no one being there he informed her that he had sent Ivan Harris, a Deputy Sheriff, to

talk with Braswell and that Braswell was not going to hurt her; while she was moving out Mike Braswell, their son, arrived and she showed him an envelope addressed to him that contained a letter written by Braswell which stated:

> Well, Mike by now you already know what has happen[ed] . . . . All I can say is son I loved your mother, and I just couldn't stand to see her leave me . . . . I just hope Mike that you didn't have to see this mess. But if you did, please put it out of your mind. And please don't ever go back to this house again, it'll only hurt you more. Mike get Jimmy to help you with the property settlement, he knows what to do . . . . Please, Mike don't hold this against me. I know it's the worst thing anyone can do, but I feel there is a reason for doing this. I just need the rest, and I couldn't go alone . . . . Mike there is one thing I would like for you to make sure it is done. I would like very much for me and Lillie [to] be placed side by side, along with granddaddy in Wilson. There might be some talk about that, but please be sure that we are placed beside each other . . . . And Mike I'm sorry for doing this to you, but I just can't see any other way. I just love Lillie too much to see her leave me . . . . Dad.

Envelopes addressed to Jimmy Braswell, his brother, and to Deputy Sheriff Brooks Oakley, a friend and co-worker, were also found but not opened before her death. She telephoned defendant about finding the three letters and told him what the one to their son said.

After moving out of the house Lillie Braswell spent the first three nights in Greenville with Marguerite Taylor, a friend, who telephoned defendant that she was there. She spent the following night in Farmville with Lila Joyner and the next in Fountain with Hilda Joyner and told both friends that defendant had promised her protection and had assured her that she did not have to leave Pitt County, that Braswell was not going to hurt her, that he would see that she got back and forth to work safely and would see that Braswell did not bother her, and that his men would be keeping an eye on her. On Monday morning, 27 September 1982, when she left Hilda Joyner's house to go to her job in Greenville she stated that she was going to be alright. While in her car alone on Chinquapin Road, Braswell, in a vehicle of the Sheriff's, pulled her car over to the shoulder of the road and shot her to

death. Braswell then went home and shot himself; but he recovered and was eventually convicted of murder and given a life sentence.

*Marvin Blount, Jr. and Joseph T. Edwards for plaintiff appellant.*

*Womble Carlyle Sandridge & Rice, by Richard T. Rice and J. Daniel McNatt, for defendant appellee Ralph L. Tyson.*

PHILLIPS, Judge.

[1] The claim based upon *respondeat superior* having been eliminated from the case, the determinative question presented by this appeal is whether plaintiff's evidence tends to show that some independent negligence of defendant Sheriff proximately contributed to plaintiff's intestate being killed by Deputy Braswell. Plaintiff contends that the evidence tends to show defendant's negligence in three respects, the first of which was failing to protect plaintiff's decedent from an attack by Billy Braswell after promising her that such protection would be provided. This theory of legal liability is authorized by our law, though the general rule is that ordinarily law enforcement officers have no duty to protect individuals from criminal attack, their duty being only to the public at large. In *Coleman v. Cooper*, 89 N.C. App. 188, 366 S.E.2d 2, *disc. rev. denied*, 322 N.C. 834, 371 S.E.2d 275 (1988), it was held that the general rule is subject to two exceptions: The first, obviously not applicable to this case, is based on the special relationship that exists between an undercover agent, informant or a State's witness and the police when a person dangerous to the cooperating person is being investigated or prosecuted. The other exception, a "special relationship" exception of another type, arises when (1) police protection is promised to an individual; (2) the protection is not forthcoming; and (3) the individual's reliance on the promise of protection is causally related to the injury suffered. This exception to the general rule was adopted because it is unjust to deny redress when a victim of violence is lulled into not taking steps for his or her own safety by voluntary assurances of protection by the police. *Cuffy v. City of New York*, 69 N.Y. 2d 255, 260, 505 N.E.2d 937, 940, 513 N.Y.S.2d 372, 375 (1987).

Plaintiff's contention that his evidence *prima facie* establishes the three elements of the foregoing exception to the general rule is well taken, and a new trial on the issues raised by this claim is ordered. The evidence as to the first two elements — that defendant promised to protect plaintiff's intestate from Billy Braswell

and did not do so—is both obvious and plenary. The argument that the evidence as to the Sheriff's promise of protection should be disregarded because it is erroneously based upon the hearsay statements of Lillie Braswell has no basis. The court received the hearsay statements into evidence after making the determinations required by Rules 803(24) and 804(b)(5), N.C. Rules of Evidence, and all of the determinations are well supported by evidence and reason. As to the third element of this claim—that the reliance of plaintiff's intestate on the promise of protection was causally related to her death—the evidence, though not without conflict, supports the inference that she did rely on the promised protection and that her death causally resulted therefrom. Leaving aside the evidence that indicates that she sometimes doubted that defendant was keeping his promise to protect her, since for the purposes of the appeal contradictions and inconsistencies in the evidence unfavorable to the plaintiff must be disregarded, *Murray v. Murray*, 296 N.C. 405, 250 S.E.2d 276 (1979), this element is supported by evidence that though Braswell had threatened to kill her she did not leave the county or go into hiding; did not have or seek to obtain a traveling companion; did not carry a weapon or quit going to her job; did not file an action under Chapter 50B of the General Statutes to restrain him from molesting her; and stated on the morning she was killed that she was going to be safe. These actions and words tend to show that she believed that the Sheriff's officers were monitering her movements and those of her husband; that under their protection she could safely continue to live and work in the county; and that because she followed that belief without taking any other steps for her own safety Braswell was able to shoot her in broad daylight on a public highway.

[2] The second respect in which the evidence indicates defendant Sheriff was negligent, so plaintiff contends, was in failing to protect Lillie Braswell, a reported victim of domestic violence, in compliance with the provisions of Chapter 50B of the General Statutes. His argument is that Chapter 50B, entitled Domestic Violence, establishes an affirmative duty on the part of law enforcement agencies to protect victims or threatened victims of domestic violence upon request and that a breach of that duty gives rise to a cause of action. We do not so understand this legislation, and overrule this argument. In gist, Chapter 50B does the following: By G.S. 50B-2 it authorizes one threatened with domestic violence to file a civil action and seek the court's protection; by G.S. 50B-3 it

authorizes the court to hear and determine such actions; by G.S. 50B-4 it provides for enforcing the court's orders; by G.S. 50B-5(a) it authorizes one allegedly threatened with domestic violence to request the assistance of local law enforcement agencies, requires a law enforcement agency so requested to respond as soon as practicable and authorizes such agencies to advise complainants of sources of shelter, recommend treatment facilities, transport them to such facilities when feasible, and to take such other steps as are reasonably necessary to protect a complainant from domestic violence. G.S. 50B-5(b), especially relied upon by plaintiff, reads as follows:

> In providing the assistance authorized by subsection (a), no officer may be held criminally or civilly liable on account of reasonable measures taken under authority of subsection (a).

G.S. 50B-6 states in pertinent part, "This Chapter shall not be construed as granting a status to any person for any purpose other than those expressly stated herein." G.S. 50B-7 provides that the remedies are in addition to others authorized by law, and G.S. 50B-8 concerns protective orders. None of these provisions, in our opinion, nor all of them collectively, make it the affirmative duty of a law enforcement agency to assist anyone threatened with domestic violence. Their effect, it seems to us, is limited to enabling such persons to more readily obtain the court's protection and such assistance as any local agency approached sees fit to give. The provision of G.S. 50B-5(b) absolving officers from liability if reasonable measures are taken cannot be construed as a directive to take such measures. See *Turner v. City of North Charleston*, 675 F.Supp. 314 (D.S.C. 1987). In all events Chapter 50B has no application to this case because Lillie Braswell sought no relief under it by filing the authorized civil action.

[3] The final negligence of the defendant that plaintiff contends his evidence tends to show was continuing Billy Braswell in his employ and failing to properly supervise him after learning that he was unfit to carry a gun. Recovery from a law enforcement agency under this theory has been authorized by some courts under certain circumstances. *Bonsignore v. City of New York*, 683 F.2d 635 (2d Cir. 1982) and *Marusa v. District of Columbia*, 484 F.2d 828 (D.C. Cir. 1973) stand for the proposition that a law enforcement agency or other employer can be liable for a shooting injury or death which was proximately caused by the employer's negligence in hiring, training, retaining, or supervising the officer. In both

cases, the shootings occurred while the officers were off duty, their service revolvers were the fatal weapons, and each officer was required by regulation to have his service revolver with him at the time involved. Assuming *arguendo* that this theory of legal liability is valid here, it cannot benefit plaintiff because the evidence does not indicate that Lillie Braswell's death proximately resulted from Billy Braswell being entrusted with a gun by the Sheriff. For the evidence does not indicate either that he was required by defendant to carry a gun while off duty, as he was at the time of the shooting, or that his service revolver was the fatal weapon. Whether Billy Braswell killed her with the service revolver furnished by defendant or with one of the several other guns that he owned, the evidence does not show. Thus, entrusting Billy Braswell with a police revolver has not been shown to be a proximate cause of him shooting plaintiff's intestate, and this claim was also properly eliminated from the case.

New trial.

Judge COZORT concurs.

Judge GREENE concurs in part and dissents in part.

Judge COZORT concurring.

I write only to emphasize that this opinion does not either establish new law or create a new cause of action. As Judge Phillips pointed out, *Coleman v. Cooper*, 89 N.C. App. 188, 366 S.E.2d 2, *disc. review denied*, 322 N.C. 834, 371 S.E.2d 275 (1988), stands for the proposition that liability arises when a law enforcement officer creates a special duty to an individual by promising protection to that individual, the protection is not forthcoming, and the individual's reliance on the promise of protection is causally related to the injury suffered. *Id.* at 194, 366 S.E.2d at 6. This panel is bound by the holding in *Coleman. In Re Harris*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989). Our task in the case below is to apply the principles enunciated in *Coleman* to the evidence presented at trial. Our review of the evidence reveals that, contrary to the facts in *Coleman*, plaintiff produced some evidence of each essential element, *i.e.*, the promise of protection, the lack of protection, and a causal relation between the reliance and the injury. The inconsistencies in the plaintiff's evidence and the defendant's evidence

to the contrary present questions for the jury to resolve. Thus, plaintiff is entitled to a new trial on this theory alone.

Judge GREENE concurring in part and dissenting in part.

I

The plaintiff alleges three bases of recovery. First, under the *Coleman* theory the plaintiff essentially seeks to show that the defendant breached a promise to provide protection. Second, the plaintiff seeks to show defendant's liability arising from defendant's alleged breach of a duty arising from N.C.G.S. § 50B. Third, the plaintiff seeks to hold the defendant liable for negligent supervision or retention. On the first basis I concur with the majority. On the second basis I concur in the result, and on the third basis I dissent.

II

I disagree with the majority's interpretation of N.C.G.S. § 50B. The majority opinion states: "None of these provisions, in our opinion, nor all of them collectively, make it the affirmative duty of a law enforcement agency to assist anyone threatened with domestic violence." Section 50B-5, entitled "Emergency assistance" requires that, when called upon by a person alleging that he or she is the victim of domestic violence, a "law-enforcement agency shall respond to the request for assistance as soon as practicable . . . ." N.C.G.S. § 50B-5(a).

N.C.G.S. § 50B-5(b) states that an officer providing assistance pursuant to § 50B-5(a) may not "be held criminally or civilly liable on account of reasonable measures taken under authority of subsection (a)." Section 50B-5(b) does not eliminate liability where the officer acts unreasonably in his response or in his lack of response to a § 50B-5(a) request for emergency assistance. It is not necessary, as the majority suggests, as a prerequisite to imposition of liability, for the plaintiff to have sought and received a domestic violence order. Section 50B-5(a) operates to protect victims of domestic violence in emergency situations where no order has been issued. Section 50B-4(b) operates to protect victims of domestic violence where an order has been issued.

An emergency situation is presented when the victim is confronted with "[a]n *unexpected* . . . or *sudden* occurrence of a serious and urgent nature that demands immediate action." American

Heritage Dictionary 488 (2d ed. 1976) (emphases added). Here the victim was not confronted with an emergency. The threats to her life occurred over a period of several days, and at the time of the attack she was no longer living under the constant threat of Billy Braswell's (Billy's) presence. Therefore, I concur with the majority that the trial court did not err in granting the defendant a directed verdict on this theory of recovery.

### III

Regarding plaintiff's third theory of recovery, the majority finds the asserted theory inapplicable since the evidence does not show that Billy used his service revolver to kill the victim. I disagree.

"The general rule is that the relationship of master and servant does not render the master liable for the torts of the servant unless connected with his duties as such servant, or within the scope or course of his employment." *McArthur Jersey Farm Dairy, Inc. v. Burke,* 240 So.2d 198, 200 (Fla. Dist. Ct. App. 1970); *see O'Connor v. Corbett Lumber Corp.,* 84 N.C. App. 178, 182, 352 S.E.2d 267, 270 (1987) (employer responsible if act of employee was within scope of employment). However, as an exception to the general rule, the employer is liable for tortious conduct of an employee committed outside the scope of employment where:

> (a) the employee is engaging in or shows a propensity to engage in conduct that is in its nature dangerous to members of the general public; (b) the employer has notice that the employee is acting or in all probability will act in a manner dangerous to other persons; (c) the employer has the ability to control the employee such as to substantially reduce the probability of harm to other persons; and (d) the other person must in fact have been injured by an act of the employee which could reasonably have been anticipated by the employer and which by exercising due diligence and authority over the employee the employer might reasonably have prevented.

240 So.2d at 201. This cause of action is outlined in the Restatement of Torts as follows:

> § 317. Duty of Master to Control Conduct of Servant
>
> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others

or from so conducting himself as to create an unreasonable risk of bodily harm to them, if

(a) the servant

(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

(ii) is using a chattel of the master, and

(b) the master

(i) knows or has reason to know that he has the ability to control his servant, and

(ii) knows or should know of the necessity and opportunity for exercising such control.

Restatement (Second) of Torts § 317 (1965). Furthermore:

There may be circumstances in which the only effective control which the master can exercise over the conduct of his servant is to discharge the servant. Therefore the master may subject himself to liability under the rule stated in this Section by retaining in his employment servants who, to his knowledge, are in the habit of misconducting themselves in a manner dangerous to others.

*Id.*, at Comment c. *See also* Restatement (Second) of Agency § 213 (1958) (person acting through agents liable for harm resulting from his reckless or negligent supervision, or in failing to prevent tortious conduct by others using instrumentalities under his control); 53 Am. Jur. 2d *Master and Servant* § 422, at 436-38 (1970). This Court has previously recognized the viability of Restatement (Second) of Torts § 317 for determining the liability of employers for tortious conduct of employees committed outside the scope of employment. *See O'Connor*, 84 N.C. App. at 182-86; 352 S.E.2d at 270-72 (action for negligent hiring or retention).

The evidence in the light most favorable to the plaintiff reveals that: the victim was shot to death by Billy and was found in a ditch beside her car which was located alongside a public road in Pitt County; that at the time of the homicide, Billy was operating a patrol car entrusted to him by the defendant; that the defendant was aware that Billy had physically abused the victim in the past; that Billy was acting in a strange and peculiarly threatening man-

ner toward her at the time; and had written letters indicating intent to kill her. From this evidence a jury could find that Billy was showing a propensity to engage in conduct dangerous to the victim; that the defendant had notice of such conduct; and that the defendant could have, by refusing to provide him with a gun and patrol car or by discharging him from employment, reduced the probability of harm to the victim, in that the victim was in fact harmed in a manner that could have been anticipated and might reasonably have been prevented by the defendant.

Thus, I would hold that the trial court erred in directing a verdict for the defendant on this theory of recovery.